Proceed to our second argument of the morning. It's Appeal Number 21-3268. Nelson Garcia, Jr. v. Randall Hepp Proceed to our second argument of the morning. Okay, Mr. Blumling, good morning. Good morning. May it please the court. Section 2254 forecloses habeas relief to a petitioner unless the petitioner can show that the state court's decision was based on an unreasonable application of United States Supreme Court precedent or that it was based on an unreasonable determination of the facts in light of the evidence presented. And this is an intentionally difficult standard for a habeas petitioner to meet. And this court should reverse the decision in order of the magistrate judge because Mr. Garcia failed to meet this standard on both of his claims. Can I ask you two questions? Sure. Was Mr. Garcia on bond? You know, it's very unusual to go through six different lawyers. There's this element where the trial court judge says he's trying to delay the case and the prosecutor is saying he's trying to delay the case. But I looked back at the calculation of his sentence as to when he would be released from prison, and it seemed like he only received like 200 days in credit for the time he served in pre-sentence detention. He was on a probation hold from a prior conviction. Okay. And then so his original arrest was, I believe, in very early January. Right. And the CR 215 was filed, I believe, January 4th. His initial appearance in this case was January 7th. I think it was February 12th or 22nd, I want to say, he was revoked on his prior conviction. So he was in jail the whole time. He didn't make bail. He was in prison at points during all of this. He was occasionally appearing remotely by video conference from prison, and he was occasionally actually brought for an in-person appearance. But he wasn't free. He wasn't just appearing. No. No, I don't believe at any point he was. And the second question is, he makes an allegation in front of the trial court at one point that under the Wisconsin Constitution, basically criminal defense have the right to file pro se motions. So he can act as his own lawyer at the same time, which seemed weird to me. Is that right under the Wisconsin Constitution or is that wrong? I've never seen a case that says that, Your Honor. I think the prosecutor, the defense attorney, and the judge in this case all seem to indicate that that's not the case. Because he was a prolific filer, I saw. He was. And at one point the judge said, I won't hear from you anymore. I'm not going to take any more of your pro se motions. And he said, well, I have a right under the Wisconsin Constitution to file these motions. That's correct. And I don't believe that Ms. Morshead is arguing that that was the case. Right. I didn't see that. I didn't see that. But no, there's no Wisconsin case that gives a defendant that right. And looking through the record in this case, this kind of gets into the second issue. But looking through the record in this case, I'm really struck by how many pages of a represented defendant just giving colloquy after colloquy after colloquy on the record. I think for one point he spoke for 20 straight pages. Sure. Yes, absolutely. 20 pages. And the court, I don't recall if it was the second judge or the third judge to handle the case, but at one point the court actually commented on that and said that he certainly had a lawyer's understanding of what a brief statement is. But the sort of subtext in all of that is that Mr. Garcia's unwillingness to sort of accept rulings, accept the advice of counsel, try to play by his own rules, I think is really what sort of set up the problem for the court when it concluded that he had forfeited his right to represent himself. So this is, again, kind of... One thing I didn't see, I was curious about this, but one thing I didn't see in the district courts in Judge Joseph's analysis on the second issue, there's no analysis, you know, multiple times, multiple times, he engaged with the judge in long colloquies about not wanting to proceed pro se. He's adamant that he's firing lawyer after lawyer after lawyer, which sometimes we see, not often, you know, you don't often get sex lawyers. But he engages in these colloquies where he's adamant with the judge, where I do not want to proceed pro se. And then he says, now I do want to proceed pro se. And it seems to me, and Judge Joseph doesn't analyze this, but it really puts the state trial judge in a very difficult position between a rock and a hard place. You've told me how many times you don't want to proceed pro se. Now you do. You won't follow my instructions. You won't answer my questions. What am I supposed to do at this point? Right. And I think, you know, in Mr. Garcia's brief, he talks about how a lot of these colloquies were geared towards the first issue, the whole Riverside-Rothgary issue. And he wanted that heard. He wanted that heard. His attorney didn't believe it was a meritorious issue. One of his attorneys eventually did file a motion to suppress, based on both the Sixth Amendment issue and on the nature of the show itself, or of the lineup itself. Mr. Garcia, even with this motion filed, he sort of continues in his tactics. He continues with his pro se colloquies. He continues with his filings. He continues to harass his attorneys, including one attorney who has said that, you know, he's not sure what to do if the motion is denied shortly before trial, and Mr. Garcia insists on an interlocutory appeal. I think at one point Mr. Garcia says he has the right to an interlocutory appeal. He does not. Under Wisconsin law, that is not an appeal as of right. That is a permissive appeal. He would have the right to petition the Wisconsin Court of Appeals to hear that appeal as an interlocutory appeal. But unless and until the Court of Appeals were to grant that petition, the circuit court has all the authority, has all the jurisdiction to continue in its case. The trial court then hears the motion, denies the Sixth Amendment claim, and immediately Garcia changes his tactics. He no longer has this available to try and stall. So now he says, well, I want to represent myself. And so I think with all of that background, looking at everything that had happened at that point, the court was rightly skeptical that he actually wanted to represent himself, and it was completely reasonable for the court to believe that this was actually just another delay tactic. Once Mr. Garcia sort of presented his argument to the court on why he wanted to proceed pro se, he showed a complete unwillingness or inability to adhere to the court's rules and essentially to take no for an answer. And that was going to be, I think, a big, big problem if this case were to move to trial. So under all of that, I would say that the court's decision that Mr. Garcia had forfeited his right to represent himself, I think, was proper under all of that backdrop. It seems like, too, that this is a reason we give great deference to the trial judge in the first place, because some of those dynamics going on in the courtroom after a history with a defendant who is not cooperative, the trial judge is in the best place to make that determination. I absolutely agree with that. And I think even more to the point, I think the Wisconsin Court of Appeals would defer to a lot of this with the trial court's determination, and now here we are in federal habeas world where I think we're even further removed from that question. So I think deference to the trial court on what it believed Mr. Garcia was doing, I think, is very appropriate under these circumstances. Mr. Bowman, can I shift you to the Sixth Amendment? I'm sorry? Can I shift you? I was going to shift. I was going to say the exact same thing, but go ahead. Yeah, can we shift you to the Sixth Amendment? Absolutely. And, Rothger, don't you think the Wisconsin Court of Appeals overread Rothgerry with respect to physical presence at this initial appearance? I don't. I think when you look at what Rothgerry was really looking for, I think it sort of points to three things, you can say. The first is an in-person appearance or an appearance before the court, whatever that means. The second is informing the suspect of the accusation against him. And then the third is restrictions on liberty. Okay. Can I challenge you on that a little bit? Sure. On the first part of it. Okay. Okay. When you look at Rothgerry, you've read it zillions of times by now, okay? The court places a lot of emphasis on the, you know, when the machinery of the government, right, turns against an individual. And then what I focused on, you can tell me it's mistaken, is footnote nine of Rothgerry. You got it there? Yeah, I'll put it up here. Yeah. Okay. So at the end of a footnote where they're talking about what's going on in Texas and with Texas criminal procedure, Justice Souter for the court writes, what counts is that the complaint filed with the magistrate accused Rothgerry of committing a particular crime prompted the judicial officer to take legal action in response here to set the terms of bail in order for him to be locked up. Okay. So under that formulation, and that's what the court says, what counts? That seems to erase that first part of your three-part test. I disagree, Your Honor. And here's why. Rothgerry, Rothgerry. I'm actually not sure how it's pronounced, but the big question in this case was about prosecutorial knowledge, right? Did the prosecutor know that the, that the defendant had been charged? Because that's essentially how the, how the case came to the court was this rule that because the prosecutor didn't know, it could not have counted as a criminal complaint that, that initiates the entire proceeding against the defendant and therefore attaches the sixth amendment right to counsel. So when you, when you look at this footnote kind of in light of that context, I think that's actually what it's getting at is, is that regardless of whether the prosecutor knew that this was happening, the contents of the document were sufficient to make. Why does the sixth amendment right turn on the knowledge of the prosecutor? It doesn't. It doesn't. That's what the court in Rothgerry said. Yeah. Okay. All right. Let me give you a different hypothetical. Okay. Let let's suppose we have somebody arrested on a murder charge. They're jailed. They have a CR two 15 proceeding. Probable cause is found and no bail is set. The judge decides there's no set of conditions under which you're going to be released. Does the sixth amendment right attach on that result? I would say no. Okay. Now let's suppose that that John Doe. Okay. Is on his way to make an appearance on the charge after the two 15 proceeding. Okay. And when he's being walked over, the detective informs him of the outcome of the two 15 proceeding. There's been a probable cause determination made by a magistrate under this thing in Wisconsin, we call CR two 15 and you're, there is no bail. You will be held. Has it attached then? I don't think so because he's not being informed of the charge against him by the court. I think, um, in your, in your hypothetical, I think maybe the closest analogy there is a defendant being arrested and pursuant to a, but if you take the language in Roth, your attachment occurs when the government's used the judicial machinery to signal a commitment to prosecute. Okay. I said, I sure think that's met. I'm now in a jail cell and I'm now being walked to a lineup on a murder charge. And I've been informed that that's been found by a probable cause. And, and I'm, I'm going to be here. I can't, there is no bail, right? Seems like that test is met. I think again, I mean, that that's certainly a closer case than what we have here, your honor. But again, I think, um, the way I read Roth Gary is that it actually requires the in-person appearance in front of the court, um, in order to, uh, why though, why as a matter of sixth amendment law is the in-person appearance important? I think, um, it's actually kind of tied to what the second factor is. And I see that I'm getting in my, my rebuttal time. So I'll, I'll move quickly. But, but I think the, um, I think when you look at it, the second, um, thing it's that the defendant is informed of the charges against him by the court. I think that's sort of the subtext here is that, um, again, it all comes back to the commitment to prosecute. Doesn't that almost encourage some bad behavior? You could have charges brought against you. The court could make a bail determination. The defendant could learn about it. The document could be given to the defendant about what he's charged with and what the bail determination is. And solely because he hasn't gone into court and heard it from a judge, he's not entitled to counsel. What if you decided to, what if they said, okay, he's been charged. Bond has been denied, you know, come here, Mr. Garcia, let's sit down at the table and talk. And he doesn't have a right to an attorney. I think at that point, you're still, you still have the, the fifth amendment protections, um, for example, sitting down at a table. Um, it's the question of fifth amendment protections versus sixth amendment protections. Hold on. I think in judge St. Eve's question, what I worry about on that hypothetical is an evasion of Wade. So the U the Supreme court held in weight is, you know, that, that, that lineup is a critical stage, right? So if you just say, look, look what the seventh circuit just said. So let's set up the equivalent of CR two 15 in our state. Do not take these people into the courtroom. Do not do that because lawyers are going to get involved then. And we can do these lineups without lawyers. That's a good thing. The lawyers just get in the way. Problem. Go ahead. We'll give you, you're going to, we'll give you a couple of minutes. Um, so I, I think, um, the, the Wade question I, in my mind cuts both directions. I think the fact that an individual has a right to have counsel, um, at a, at a lineup, once the right to counsel has attached is, um, I mean, it's been held to be a critical stage, but at the same time, if the, if the whole point of the hypothetical is to say, let's do something to make sure it does not attach. And that's what I meant by bad behavior. But wait a minute. Let me ask you that. Let me, let me add to that. Police officers do that all the time. That's a very effective policing technique, right? They do it all the time with various circumstances. We don't want to do this because if we do this, some right attaches. So we're going to do it a different way because we're trying to catch the So answer judge Scott's question. Is it a, is it a problem? And if it is, why? So, no, it's not a problem. And specifically with the lineups, I think the fact that a lineup when, when the sixth amendment right to counsel has indisputably not attached, you can have a lineup. The defendant, the suspect at that point does not have a right to counsel. So the fact that you could have some scenario where a state could evade that, I don't think there is some, some sort of massive flaw in that system because you know, the issue hasn't come up where we've said that under all circumstances, you know, it's not part of the Miranda warnings, for example, under all circumstances, if you're subject to a lineup, you get an attorney there. That's not the case. And so I think the fact that the, you know,  there's a way to, to work around that. I don't think is a, is a big problem as evidenced by the fact that that lineups often don't physical presence matter. What's the significance of that? I think looking at, at Roth, Jerry, I think in my mind, that's, that is the big distinction between something like an arrest pursuant to a warrant. For example, Riverside is a, is a post hoc review of the probable cause to have arrested somebody. When you have an arrest warrant that happens ahead of time. But in both cases, you still have a probable cause determination and you have detention, right? You have a restriction of liberty. Someone's arrested. What distinguishes moving into the sixth amendment realm is that the, the appearance, the in-person appearance, not, not some form has been filled out somewhere and we don't know. But the in-person appearance is what really crystallizes or solidifies the state's, you know, prosecution, the state's commitment to move forward. And is that because the, the, the, the defendant, if you will, is, is consciously aware that the wheels of justice are turning against him. In other words, he can't claim ignorance because he's present. That's at least part of it. I think, yes. Why would you require a presence as opposed to just a document? I, for that, I would go back to Roth, Gary again, and, and Roth Gary considering the question of prosecutorial knowledge. Part of the reason the court dismissed that as a standard is because it was unworkable. So I think the document, you also have sort of knowledge of the defendant, right? Has the defendant received the document? When did he receive the document? We don't know in this case, the record's silent on that. You'd have to, you'd have to ask someone in the prison like document, right? It went, arrived at the prison mailbox, 1225 PM, went into his pod at 135 PM, handed to the defendant by this person on 235 PM. Right. I mean, this you have to do to establish knowledge that he had it. Right. Exactly. I mean, unless you presume that once it was mailed to him, he got it, which would be weird. Exactly. Exactly. Because I think if, if that's the presumption, if there's some sort of a mailbox rule or something along that lines, where as soon as it's signed, you run into a couple of circumstances. That can be very odd. First is what if they're in the middle of the lineup? Yeah. My guess is delivery in the, in the, in the mail, in the, in the jail, delivery of mail is not all that prompt. Right. And I, yeah, I, I, I just, I'm just guessing. I haven't had the pleasure myself, so I don't know, but I, I would say that if, if the, if there was some sort of mailbox rule that the court wanted to look at, we say, okay, well, it's, it's arrived in the inbox, or it's placed in the outbox or whatever the case may be. That completely steps away from the language in Roth. Gary talking about the, the knowledge of the defendant, essentially, as you, as you put it, that the wheels, the machinery is turning against her. Okay. We, we got your position. We'll give you a couple of minutes on rebuttal. Ms. Morrishead. Good morning. If you go a few minutes over, don't worry about it. We were giving a lot of questions to Mr. Blumling and you'll have equal opportunity yourself. Thank you. Good morning. I guess I will go back to the beginning and go back to the first or the second issue. The Feretta issue first. I, I think just to address some of the points that the court raised in its questioning it's important that with regard to this idea that Mr. Garcia was seeking delay, that's kind of thrown out by the courts at various points, this idea, well, this was done for purposes of delay. There's really no evidence in this record that Mr. Garcia had anything to gain by delay. And I think that's one of the things that the court was getting at. Well, wait a minute. That, that's a hard argument to make. I mean, this case, from what I understood, there's a three day trial that was largely based on witness identification, right? There's a lot to gain by delay for defendants. It's extremely unusual for a defendant to seek six lawyers. Never did he ask for a speedy trial. This is a bank robbery case. It took three days to try and took three years to bring to trial. There are massive gang and Rico and public corruption cases with millions and millions of documents and discovery that are brought to trial before three years. I guess what did he have to lose? Well, what he had to lose was that at least for the last eight months of this prosecution, he was in custody on this case and nothing else. So he was being held only on this case at that point. But does delay really matter to the analysis? Because the, while the court noted he was likely attempting to delay, that's not what the court based its determination on in denying him the right to represent himself. He based his, the court based the determination on his conduct and difficulty and concern that he couldn't essentially behave himself in court because he had demonstrated he couldn't behave himself in court. So with regard to that point I think just to go back to the standard that the court of appeals applied in this case, the standard for determining whether somebody has forfeited the right to counsel or I'm sorry, the right to proceed pro se is whether he is deliberately engaged in serious and obstructionist misconduct. The court of appeals instead applied a frustration of judicial efficiency standard, which is not the same standard. So even if, if the court of appeals applied the wrong standard, I'm not sure about that, but let's assume they did. And we review it de novo. On this record, given the conduct and the EDPA deference, how do you get around the six attorneys, the statements about him being disruptive, the fact when he's engaging in this colloquy, the deputies in the courtroom got so concerned they got up and moved over toward him. There's a lot in this record about your client's conduct here. Okay. And I, and I would like to break that down a little bit because the court of appeals made this factual finding that, um, that he had, uh, had engaged in all of this misconduct and that the record was replete with follow the constraints of the courtroom. And really at every stage of these proceedings, um, I have asked in briefing for the state to point to an example of that because going back through the record of in this case up until, and I think what happened on the day when the court denied his, his right to proceed pro se, I'll take that in a second, but, but the state is asking us to go back and look at everything that happened before. And, you know, it is true that Mr. Garcia filed a lot of pro se filings. It is also true that the court was perfectly in its right within its rights to ignore those. If the court shows to, uh, Mr. Garcia thought that he had a right to file those pro se filings. He was wrong about that. He also at one point said that he had a right to file an interlocutory appeal. He was wrong about that too. But being wrong is not misconduct. If, if making legal assertions that were wrong were misconduct, there'd be a lot of lawyers in trouble, right? But he was shuffling. Go back to the observations that judge Kirch was making as he's shuffling through a half dozen lawyers here. I don't think that's a fair characterization. I know the state uses the word cycling over and over to describe it. And really, I mean, the first few lawyers in this case, they, they left this case for reasons that had really nothing to do with their relationship with Mr. Garcia. In fact, the court at one point said, I'm not going to hold Mr. Garcia responsible for what happened back in, in 2012 because there was clearly something going on in the public defender's office. So it's really not fair to lay all of those lawyers at Mr. Garcia's door. And, and so what happened was Mr. Garcia, with regard to his last three lawyers was very, um, dissatisfied with the representation that he received from his last three lawyers. And there was good reason for that. And there's a fair amount in this record about why he was dissatisfied, um, with regard to, um, with regard to attorney Harris. Um, attorney Harris on the record told the court that Mr. Garcia had asked him to withdraw and he had refused to do so. Um, the state in its, in its reply brief, um, sort of argues that, um, that it's, that there, that there was nothing wrong with that or that it's wrong for Mr. Garcia to suggest that there was something wrong with that. That's a, it's a blatant ethical violation for a lawyer to refuse to withdraw. But there was more with Harris than that. Harris moved to withdraw citing the quote volatile, hostile and confrontational relationship with Garcia. That's true. And when it came time to come into court and explain the reasons for, uh, his motion to withdraw, all he could cite to was that Mr. Garcia had filed some OLR complaints against him. So I, you know, I know at one point in its reply brief, the state makes this point that Mr. Garcia has failed to explain his abuse of these attorneys. Well, that's because he doesn't concede that he abused his attorneys. Those are, are not, uh, settled facts in this case. Those are not established facts in this, in this case, that Mr. Garcia was abusive toward his attorneys. There wasn't a hearing on that. There were no factual findings. In fact, when those attorneys made those allegations in court, Mr. Garcia was not even asked to respond to them. So what those are, are accusations that attorney Harris made in a filing and did not repeat in court and an accusation that attorney Bonnison made in court, um, in the course of trying to withdraw. What was that? What's that lawyer's name? Bonnison. Yeah. Was he the one who said, I'm, I'm sick of this guy's abusive. I've had it. Yes. Yeah. Okay. And then, you know, again, the same one who said it's the worst harassment he'd had from a client in 40 years, 30 years, 30 years, 40 years, same judge, the whole way through on at least these last couple, these lawyers, Harris and this fellow we're talking about now. Well, no. So that's another, another point that, that I wanted to make. The state in its reply brief talks about how, when judge Pocan made the decision to deny this right to proceed pro se, the state says, argues that this judge had been sort of dealing with Mr. Garcia's, you know, misbehavior for years and was, was making a decision against that backdrop. Um, judge Pocan came to the case late. And in fact, when Mr. Garcia appeared, um, at that hearing where his, where he requested to proceed pro se, uh, judge Pocan had only seen him on four previous occasions and, um, on only two of the transcripts of those previous occasions are in the record. Um, in one of them, it was just Mr. Garcia sort of politely explaining, uh, why it was that he wanted attorney Beeler to withdraw. Uh, and that was the hearing before the final hearing. And in one of them, it was the motion hearing on the Roth green motion at which Mr. Garcia did not say a word. So judge Pocan's experience with Mr. Garcia, which was actually quite limited and he wasn't making a decision based on sort of observations that he'd made of him over the years. He didn't know that Mr. Garcia had had previous attorneys. It is true. Um, and you know, with regard to Mr. Garcia's dissatisfaction with those attorneys, um, you know, there was his dissatisfaction for attorney with attorney Harris, who initially didn't want to proceed with the Roth green issue. Then attorney Bonnison was refusing to litigate the Roth green issue. And Mr. Garcia was frustrated about that. He had done some research and he was not wrong that this was an issue. And, uh, attorney Bonnison was refusing to, um, to, you know, to present that issue. And then attorney Bonnison appeared in court, um, and congratulated himself on going over the discovery with Mr. Garcia for a number of hours on June 10th. Um, and told the court that he had in his mind, gone above and beyond the call of duty by going over the discovery with his client. And that in fact, no other attorney had done so to that point. Although at that point the case had been pending for two and a half years. So Mr. Garcia was, was not without substantial reasons to be very concerned about the representation that he was receiving. Then attorney Beeler, um, comes on the scene and attorney Beeler, uh, you know, basically, um, Mr. Garcia is concerned that attorney Beeler has represented him for five and a half months and hasn't come to see him yet. And that even though a trial date is set in 11 days at this point, attorney Beeler, um, still doesn't have all of the discovery materials. And in fact, asking Mr. Garcia for discovery materials. So Mr. Garcia had reasons, substantial reasons to be very concerned about the representation that he was receiving. And one of the points I know the court was, was making and questioning was this idea that Mr. Garcia kept saying that he didn't want to represent himself. And it's true. He didn't, he wanted to be represented by counsel. He wanted counsel that he had confidence in. There were good reasons why he didn't have confidence in his attorneys. These were not frivolous issues that he had with this lawyer. And there's nothing in this record to suggest that he's simply, you know, wasn't going to get in along with a lawyer no matter what his lawyer did. These were, these were attorneys who were failing to do what we would expect them to do. Um, and so Mr. Garcia did want to be represented by counsel until ultimately he was told that's it. And, and by the way, the court could have done this sooner than it did. The court could have cut Mr. Garcia off when he requested lawyers. He requested new lawyers and the court granted those requests. I don't think it's fair to call that misconduct on his part. But doesn't, doesn't that put, but my, my concern here is it puts the judge in, in sort of between a rock and hard place that the judge, at least the judges leading up to the final decision seemed to be very accommodating to Mr. Garcia. Mr. Garcia says there's a constitutional right to file pro pro se motions. That's ridiculous. I mean, we all know that there's, there's no constitutional right to file pro se motions. And we've all been involved in cases where defendants file these pro se motions. Usually judges, usually judges just say, forget it. I'm not even looking. I'm striking them before they even hit the docket. My clerk is instructed, strike them. I didn't want to see him on the docket, but none of these judges did that. They sort of bent over backwards for Mr. Garcia.  I've seen him speak to new lawyers. A lot. He speaks for 20 pages on the transcript and several times the judge says, I thought you were short. And then he even makes a joke and says, Mr. Garcia, you learned something from your lawyers. I don't know. They don't know what short means. And neither do you, something like that. It allows him to continue, continue, continue. Every time he says, I don't want to represent myself. The judge says, I'll give you a new lawyer. And then finally he says, I want to represent myself. The judge is in a very difficult position at this point. I think at least because he engages in this colloquy and then says, it reminded me of my cousin, Vinnie. You see my cousin, the next words out of your mouth better be yes or no, or you're in contempt. And he says, Vinnie says something like, I don't think you get the point. And he's in contempt. It seemed like Mr. Garcia, I'm asking you yes or no. He couldn't answer the question. I'm going to try to go back and unpack that a little bit. Yeah, you can do it. You can. I realize I'm running short on time, but I, so with regard to the court, sort of bending over backward, I agree that the court did in a number of ways. I mean, letting him talk at length, you know, paying attention to these pro se filings, granting his requests for counsel. But I don't think it's fair to equate that as to misconduct on Mr. Garcia's part for continuing to ask. The court could certainly say no. There was nothing, the state uses the word obstreperous. There was nothing obstreperous in Mr. Garcia's talking on the record. If the court gave him permission to talk on the record and didn't try to stop him and let him go on at length. And he was polite and said, please and thank you, which is how this record reads. He wasn't engaging in misconduct. He was certainly taking advantage of the latitude that the court was giving him. Um, but I don't think it's fair to call that, uh, obstruction or misconduct. Um, Miss Morrison, can I, um, switch over in a few minutes? We'll spend here on the sixth amendment issue real quick. Um, what, uh, having read Roth, Jerry, as you have, what, what's the legal rule coming out of Roth, Jerry, in your view, if you had to capture it in a sentence or two, what would you say? I think the court captured it reading footnote nine, which I think is a pretty good distillation of what the court was saying in Roth, Gray. Um, you know, if you kind of strip away the use of sort of terms like arraignment and initial appearance and all of those terms sort of interchangeably, which is confusing, but I think footnote nine is sort of a distillation of what the court was saying in Roth, Gray. Um, okay. Do we read that though? Do we read footnote nine, which I, I'm, I know about, um, do we read that to the exclusion of the emphasis that's in the opinion in multiple places about the, uh, defendant's presence at that initial appearance in that Texas proceeding? It's all over that opinion. So I would agree that the word appearance and the words first appearance are all over that opinion. And I noticed this because the state in its reply brief, um, that the court of appeals, Wisconsin court of appeals, um, was reasonable in concluding that, uh, that a physical personal appearance was necessary because of what the state calls, uh, the emphasis on a personal appearance in Roth, Gray. In fact, the words personal appearance do not appear in Roth, Gray. That phrase is not in that case. Um, it does talk about appearance. It does talk about appearance, but it doesn't just eat the presence via video or otherwise. Yes. I, it does use the word appearance. It doesn't use the words personal appearance or in person appearance. And the state uses those words as, as if to assume that those are the same thing. Well, when they talk about appearance though, the Supreme court, they're talking about appearance as being significant, not insignificant. So for example, when they're talking about their own precedent, they say, our latest look at the significance of the initial appearance was in McNeil. So they use the word initial appearance. The only thing it could be referring to is the defendant being in the courtroom. I disagree. Um, and, and the reason that I do is that, um, if you look at, for example, Riverside, um, Riverside requires a defendant to be brought before the court. It expressly requires that to be brought before the court for a probable cause hearing. And it is well understood that that doesn't mean he has to be physically brought before the court. There's a decision from this court, I believe it's Blakes versus. Let's assume you're right. Let's assume you're right. That the presence references may not mean actually physically present in court. Given that the Supreme court has never said that the sixth amendment attaches when you're not present in court. So the opposite here, we're giving Ed put deference not deciding on a direct appeal. So is that enough to make the Wisconsin court's application of Roth Jerry reasonable here, given that the language we have about appearance and Roth Jerry, no case saying the counter is that enough to make it reasonable? I would say no, it's not. And that's because the distinction that the court makes that the court of appeals made, which was to rely on this idea of appearance must mean a physical appearance. I think the court of appeals knew better than that because for example, in Riverside, there was a requirement that a defendant be brought before the court, the Wisconsin Supreme court in the, in the Coke case held that Riverside said brought before, but it didn't require a physical appearance in court. So it's, it's almost as though the state has it both ways here where with regard to where Riverside hearing brought before, it doesn't mean brought before, but with regard to whether the right to counsel attaches, we're suddenly going to give a very technical interpretation to this word appearance. I think that in, in the law, not only, um, in the, in the Supreme court, but in Wisconsin, um, the Wisconsin court knows that brought before appearance, those things don't necessarily mean physical appearance. And to draw that distinction, I think that the, that the district court was correct that to draw that distinction puts form over substance and, um, and it makes constitutional rights turn on very fine, um, and technical distinctions. So that would be my answer. What about initial appearance? That's throughout the opinion, initial appearance. I know the court, are you saying that initial appearance can be satisfied without being present? Yes, because it, I believe that it's clear in Rothkrieg that the words initial appearance simply mean first appearance. That is they can't mean what an initial appearance is under the Wisconsin statutes, 970.01. The state cites Wisconsin statutes and says, that's what the initial appearance is in Wisconsin. Um, but the court in Rothkrieg said that, um, that the circumstances that give rise to the right to counsel, would, would certainly have a federal definition. That is, I don't think the state definitions and statutes of these terms have any bearing on this analysis at all. And I think it's clear from reading the decision that the words initial appearance in Rothkrieg mean. That's why you go to footnote nine. Yes. Yeah. Yeah. Okay. Um, anything further? Okay. Um, Ms. Moore said, thank you very much. Thank you. Mr. Booming. We'll give you that couple of minutes you asked for. Thank you. Um, I'll, I'll begin with where Ms. Morris had left off on this Riverside, Roth, Gary question. Fundamentally, I think what the magistrate judge's opinion and what Mr. Garcia's argument now both come down to is that the sixth amendment rights of determination was made. I think if that were the standard Roth, Gary would read incredibly differently. It would have been very easy for the U.S. Supreme court to say Riverside satisfied six amendment rights of counsel taxes done. They didn't do that. And so I think when you look at, particularly under the EDPA standard, under the deferential standard of EDPA, I think you have to say it was not unreasonable for the Wisconsin court of the analysis that it was, um, that you actually have to look at Roth through a little bit and, and consider what's it talking about. It's talking about an initial appearance. It refers to McNeil. McNeil is a Wisconsin case. You know, McNeil didn't really tackle too closely this question, but I think there's a lot there that really suggests that the initial appearance that's codified in Wisconsin statutes is in fact, the initial appearance where six amendment council at that six amendment rights council attaches on that. Um, I do want to talk about on the second issue, um, the standard for forfeiture, um, in the, in the opinion below the court said that the, uh, standard was actually the Allen standard. I, I don't understand Mr. Garcia's argument to be that even that's correct. I think that the Allen standard is not the correct standard. Um, that in fact the Faretta standard is the correct standard to understand what Martinez Martinez, the court, the U S Supreme court stated, even at the trial level, the government's interest in ensuring the integrity and deficiency at times outweighs the defendant's interest in acting as his own lawyer. So I think when you, when you weigh the standard, um, I think the, the, uh, district court was completely wrong here about Allen being the correct standard. Um, and I think in, in weighing what Faretta means, I think Martinez matters to that. Okay. Very well. Um, thanks to both counsel. We'll take the case under advisement.